The UPJOHN COMPANY, Plaintiff,

v.

AMERICAN HOME PRODUCTS CORPORATION, and Young & Rubicam, Inc., Defendants.

No. 84 Civ. 4711 (JFK).

United States District Court,
S.D. New York.

Nov. 7, 1984.

Helene D. Jaffe, Robert F. Brodegaard, of Weil, Gotshal & Manges, New York City, for plaintiff The Upjohn Co.

Steven P. Lockman, Lawrence Stein, of Arnold & Porter, Washington, D.C., Jack C. Auspitz, of Parker, Auspitz, Neeseman & Delehanty, P.C., New York City, for defendant American Home Products Corp.

Jay E. Gerber, of Davis, Markel, Dwyer & Edwards, New York City, for defendant Young & Rubicam.

## OPINION

KEENAN, District Judge:

### FACTS

Plaintiff, The Upjohn Company ("Upjohn"), moves for a preliminary injunction precluding defendants, American Home Products Corporation ("AHP") and Young & Rubicam, Inc. ("Y & R"), from the continued dissemination of advertising and promotional materials which Upjohn contends make false and misleading claims about AHP's new over-the-counter ("OTC") drug, Advil, the main ingredient of which is ibuprofen. AHP manufactures and markets Advil. Y & R, an advertising agency, prepared the television commercials and print advertisements for Advil that are the subject of this controversy. The action is brought under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

The background facts are not in dispute. On May 18, 1984, the Food and Drug Administration ("FDA") approved New Drug Applications for the over-the-counter ("OTC") sale of ibuprofen in 200 mg. tablet form under the trademark "Advil" for AHP and "Nuprin" for Upjohn. These products are approved for OTC sale for "temporary relief of minor aches and pains associated with the common cold, headache, toothache, muscular aches, backaches, for the minor pain of arthritis, for the pain of menstrual cramps and for the reduction of fever." The approved dosages for the products allow up to 400 mg. every four to six hours as necessary. The maximum dai-

ly dosage for OTC use is 1200 mg. per day, with a ten-day maximum treatment.

Prior to the OTC approval, ibuprofen had been approved by the FDA only on a prescription basis. Upjohn manufactures and sells this prescription product under the trademark Motrin. Motrin is approved for the treatment of rheumatoid arthritis and osteoarthritis, with varying dosages of up to 2400 mg. per day. Motrin is also approved for the treatment of mild to moderate pain at dosages of 400 mg. every four to six hours as necessary, and for the treatment of primary dysmenorrhea at doses of 400 mg. every four hours as necessary.

Upjohn commenced the action on July 3, 1984 by the service of summons and complaint on the defendants. On July 10, Upjohn moved for a temporary restraining order by order to show cause. In response to this motion, AHP acknowledged that the color of its Advil brand ibuprofen tablet depicted in the television commercials aired before July 10, 1984, and in the print ads and promotional material then being run and distributed, could cause confusion with the Motrin tablet. AHP informed the Court that steps were being taken to eliminate this and other potential sources of customer confusion.

Stanley Barshay, President of the Whitehall Laboratories Division ("Whitehall") of AHP, filed an affidavit dated July 10, 1984 stating at paragraph 17:

At this time, Whitehall has taken the following additional steps to clarify all print and television advertisements:

(a) A new color modified ADVIL tablet physical mock-up for photographic purposes has just been completed on an expedited basis and is being used to re-shoot a new television commercial today, which we believe will more clearly reflect the brown color of the ADVIL tablet.... The audio and visual textual portions of the commercial have been modified ...

(b) The revised television commercial contains the following audio and visual textual changes:

(i) The reference to ADVIL will visually indicate in a super (in words) that ADVIL is "from Whitehall"; and

(ii) The language "ADVIL contains ibuprofen the same medicine as the prescription drug MOTRIN now in nonprescription strength" has been modified to "ADVIL contains a nonprescription strength of ibuprofen, the medicine found in the prescription brand, MOTRIN";

(iii) The first reference to MOTRIN will visually indicate in a super (in words) "MOTRIN, the product of another company."

(c) ... This new commercial will replace our first revised ADVIL television commercial ... The new commercial will be aired about Sunday, July 15, or as soon thereafter as the networks can telecast the new commercial.

(d) The revised textual portion of the magazine advertisement ... will be used in conjunction with further revision of the depiction of the color of the ADVIL tablet and will leave no doubt that the tablet color is in the brown family. This change is expected to be completed by about July 31 ...

The Barshay affidavit continued in paragraph 18 as follows:

I have been advised by Young & Rubicam ("Y & R") of the following activities with respect to the ADVIL magazine print advertising:

(a) Hereinafter any weekly magazine will contain both the revised print copy ... and the modified ADVIL tablet color...

(b) No revision of ADVIL print advertising could be made in time to incorporate into any monthly magazine (i.e., a magazine that appears no more frequently than every three weeks) bearing an August 1984 cover date because the magazines will appear on the newsstand by approximately mid-July. No changes were possible because the magazine in which such advertising is scheduled to

appear would not accept any changes at this late date.

(c) As reflected in my June 25, 1984 letter to Upjohn ..., we took prompt steps to correct the color appearance of the ADVIL tablet in magazine advertisements. On July 2, the day before this lawsuit was commenced, Y & R contacted all magazines which will have an ADVIL print advertisement in their September issue, to determine if there was still time to effect a color change in the appearance of the ADVIL tablet. The revised ADVIL tablet color artwork was sent out on the same day. I am advised that all but one of these monthly magazines will include the revised ADVIL tablet in their September issue. The one magazine in which we were not able to effect the foregoing change the portion of the September issue including the ADVIL advertisement was already in process of being printed.

(d) The revised text copy in the ADVIL advertising will be sent out no later than July 12, 1984, to all monthly magazines that are scheduled to carry such advertising in the September issue. I am advised that three of the monthly magazines having a September cover date will be unable to include the revised print copy into that issue.

(e) All October monthly magazines will contain both the revised print copy which is set forth in paragraph 17(d) as well as the corrected ADVIL tablet artwork ...

(f) In addition to the activities as outlined in the preceding paragraphs (a) through (e), we will further color correct the appearance of the ADVIL tablet art work in other print advertising by promptly reshooting the scene depicting the three tablets. This is being done to minimize the effect of color variability from magazine to magazine.

After viewing the revised advertising materials, Upjohn withdrew its application for a Temporary Restraining Order. AHP seeks, however, to enjoin the claims made in the original Advil advertisements. It also urges that preliminary injunctive relief be granted against the revised television and print ads now being run by defendants on behalf of Advil.

These substituted ads are different from the original ads in several respects:

(1) The newer television commercial shows the Advil pill as brown, rather than orange.[1]

(2) The newer television commercial has an added "super" that Advil is "from Whitehall" and that "MOTRIN," (is) the product of another company.

(3) The substituted print ads change the color of the pill from orange to brown and indicate that Advil is "ADVANCED MEDICINE FOR PAIN from Whitehall Laboratories."

(4) A paragraph in the first print ad read as follows:

ADVIL isn't Tylenol or any other non-aspirin product and it isn't aspirin. Advil contains ibuprofen, the same medicine that's in the prescription drug Motrin. But now it's available in non-prescription strength. It's been proven effective in relieving many types of pain. It's so effective that doctors have already prescribed it over 130 million times.

This paragraph has been changed to read:

ADVIL isn't Tylenol and it isn't aspirin. Advil contains ibuprofen—the medicine in the prescription brand Motrin, the product of another company. Now ibuprofen is available in nonprescription strength in Advil. Ibuprofen has been proven so effective in relieving many types of pain that doctors have already prescribed it over 130 million times.

---

**1.** It should be noted that the brown pill mockup in the second television commercial still can assume an orange hue if the color controls on the television set are turned to make it so. When this happens, the other colors on the set go off-shade also, however. There is no question that objectively the object shown as the pill (Defendant's Exhibit WW) in the newer commercial is brown.

(5) The promotional material for the trade, pharmacies and pharmaceutical houses, has been changed so that the pill is no longer shown as orange but now appears brown in the promotional brochures.

The text referred to in the first portion of (4) above ending with the sentence, "It's so effective that doctors have already prescribed it over 130 million times," nevertheless appeared in the July 29, 1984 editions of the New York Times and the Kalamazoo (Michigan) Gazette. According to counsel for AHP, these ads were closed by the time that the affidavit was filed. Counsel for AHP admitted that the court should have been told about them in the July 10, 1984 submissions and apologized for the oversight.

The original promotional material which was distributed to the trade is still with pharmacies and pharmaceutical houses (Plaintiff's Exhibits 30 and 31 with the orange pills) and is not specifically mentioned in the Barshay affidavit as material that will be withdrawn. In this regard AHP offers new promotional material (Defense Exhibits "YY" and "ZZ") which show the pill as brown and one of which contains no reference to Motrin whatsoever. Moreover, AHP represents that they "will not use [the earlier promotional materials] further in any way. We will destroy them."

As proof of its claims Upjohn commissioned two market surveys. These surveys were conducted by the Custom Studies Division of Simmons Market Research Bureau, a market research organization, under the supervision of Valentine Appel, Ph.D Industrial Psychology, who is President of the Custom Studies Division. These surveys were conducted at shopping malls throughout the country. The first survey conducted was with regard to the original print ad. A second survey was conducted with regard to the revised television ad.

Upjohn seeks a preliminary injunction enjoining defendants, their agents, employees, attorneys and those acting on their behalf or on the behalf of their divisions, subsidiaries or affiliates or in concert with any of them, from printing, publishing, placing, distributing, or taking any other action to disseminate print advertisements, television commercials, point of sale materials, or any promotional materials or advertisements, in any medium and all media, that mention MOTRIN Tablets and/or claim directly or by implication that:

(1) Advil is the same or similar in color to a 400 mg. MOTRIN Tablet;

(2) Advil is manufactured by Upjohn;

(3) Advil is equivalent to or substitutable for MOTRIN Tablets; or

(4) The active ingredient in Advil is MOTRIN Tablets,

and from orally representing to doctors, pharmacists, other health care professionals and direct or indirect purchasers of Advil any of the foregoing messages.

## THE EARLY TELEVISION, PRINT AND PROMOTIONAL MATERIAL

Even though the affidavits of Stanley Barshay and statements by AHP's counsel indicate that none of the first series of advertisements or promotional materials will be further disseminated, the Court feels constrained to enjoin the use of any material in future advertisements or promotional materials from Upjohn which depict the Advil pill as orange or which contain the language contained in the paragraph ending with the sentence, "It's so effective that doctors have already prescribed it over 130 million times," and later seen in the New York Times and Kalamazoo Gazette on July 29. Defendants argue that an injunction in this area is barred as moot because AHP has changed the original television commercial and prepared new print ads and promotional materials. See Consumers Union of the United States v. General Signal Corp., 724 F.2d 1044, 1052 n. 11 (2d Cir.1983).

"Before a suit for injunctive relief can be dismissed as moot, the offending conduct must have ceased and the court must find that there is no reasonable ex-

pectation that it will resume." *McNeilab, Inc. v. American Home Products Corporation,* 501 F.Supp. 517, 523 (S.D.N.Y. 1980); *accord Allee v. Medrano,* 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2197–98, 40 L.Ed.2d 566 (1974); *United States v. Concentrated Phosphate Export Association,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). The affidavits submitted by AHP are not adequate assurance that AHP will not resume the "offending conduct." The July 29 ads ran after the first Barshay affidavit was submitted stating that those ads had been changed. The affidavits do not mention the original promotional materials depicting the tablet as orange. These materials are still in the hands of likely distributors of Advil. AHP has made no attempt to retrieve these materials or to instruct the trade to disregard them. Furthermore, it is doubtful that the affidavits create an enforceable commitment. *See McNeilab, Inc.,* 501 F.Supp. at 523. Even if they did create such a commitment, the affidavits are so narrowly drawn that AHP would be free to use advertising and promotional materials not specifically covered by the affidavits but containing the same offending characteristics. *See id.*

### Standard for Injunctive Relief

A party is entitled to preliminary injunctive relief under the Lanham Act if it can show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206–07 (2d Cir.1979); *American Home Products Corporation v. Johnson Chemical Co.,* 589 F.2d 103, 106 (2d Cir.1978). Applying this standard, the Court finds that the advertisements and promotional materials that depict the tablet as orange and contain the language in the first paragraph of the original print ad that ends with the sentence, "It's so effective that doctors have already prescribed it over 130 million times," are enjoinable.

### Irreparable Injury

If Upjohn can demonstrate probable success on the merits of its claim that the advertising and promotional materials violate its rights under the Lanham Act, irreparable harm will result from the continued dissemination of this advertising. *American Home Products Corporation,* 589 F.2d at 106. The consequences of Lanham Act violations "are by their nature not fully compensable by money damages." *National Lampoon, Inc. v. American Broadcasting Companies,* 376 F.Supp. 733, 750 (S.D.N.Y.), *aff'd per curiam,* 497 F.2d 1343 (2d Cir.1974). The likelihood of customer confusion, impairment of plaintiff's reputation and good will and probable diversion of customers, combined with the difficulty of proving actual monetary damages arising from Lanham Act injuries, justifies a presumption of irreparable injury once the violation has been established. *Friendly Publications v. Handbook Services,* 79 Civ. 2758 (Slip Op. October 24, 1979); *see Coca-Cola Company v. Tropicana Products, Inc.,* 690 F.2d 312, 317 (2d Cir.1982) (diversion of customers); *Selchow & Righter Company v. McGraw-Hill Book Company,* 580 F.2d 25, 27–28 (2d Cir.1978) (likelihood of customer confusion); *Gilliam v. American Broadcasting Companies,* 538 F.2d 14, 19 (2d Cir.1976) (loss of good will); *Estee Lauder, Inc. v. Watsky,* 323 F.Supp. 1064, 1067 (S.D.N.Y.1970) (impairment of reputation).

### Probable Success on the Merits

As there "is no question that irreparable harm would result from a failure to enjoin if plaintiff ultimately succeeds on the merits," *American Home Products,* 589 F.2d at 106, the Court must determine whether plaintiff has shown probable success on the merits of its claim that the advertising and promotional materials violate its rights under the Lanham Act. The Lanham Act prohibits the use of "a false designation of origin, or any false description or represen-

tation, including words or symbols tending falsely to describe or represent the same," in connection with the sale of any goods or services. 15 U.S.C. § 1125(a).

In considering a claim for relief under the Lanham Act, a court must first determine whether the advertising is false on its face. *R.J. Reynolds Tobacco Company v. Loew's Theatres, Inc.*, 511 F.Supp. 867, 874 (S.D.N.Y.1980). The color of the tablet depicted in the original advertising is false. The Advil tablet is very clearly brown. The tablet depicted in the ads, however, is orange. False visual depictions, as well as false statements, are covered by the Lanham Act. *See Tropicana Products, Inc.*, 690 F.2d at 318. Defendants' depiction of the tablet as orange, when it is in fact brown, is thus enjoinable as falsely describing the tablet.

The statements contained in the original advertising that plaintiff challenges are literally true. As the Lanham Act encompasses more than literal falsehoods, *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir.1978), the Court's inquiry does not end here. The Act also proscribes advertising that has a tendency to mislead, confuse or deceive. *American Brands, Inc. v. R.J. Reynolds Tobacco Company*, 413 F.Supp. 1352, 1357 (S.D.N.Y.1976). To demonstrate that it is entitled to an injunction against statements that are literally true, plaintiff must demonstrate the "likelihood that an appreciable number of ordinary prudent purchasers are likely to be misled" by the statements. *Mushroom Makers, Incorporated v. R.G. Barry Corporation*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *accord McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979). The public's reaction to the allegedly misleading advertising is the starting point of this analysis. *American Brands, Inc.*, 413 F.Supp. at 1356–57 (citing 1R Callman, *Unfair Competition, Trademarks and Monopolies* § 19.2(a)(1) at 656 (3d ed. 1967). Plaintiff, therefore, must submit evidence in the form of market research and con-

sumer surveys that demonstrates how the advertising is perceived by consumers and whether it tends to confuse or mislead. *See McNeilab, Inc.*, 501 F.Supp. at 525.

As proof of its claim that statements made and the visual depiction of the tablet in the original television and print ads and promotional material tend to confuse or mislead consumers, Upjohn relies on a survey that it commissioned to test consumer reactions to the print ad. In connection with this survey, Dr. Valentine Appel prepared a questionnaire that was administered to a sample of 107 male and 107 female consumers age 18 or older found in five shopping malls, two in the New York area and one in each of Los Angeles, Chicago and Philadelphia.

The respondents were shown a tear sheet of the print ad, and, while examining it, were asked to describe the main point of the ad. They were then asked to read the paragraph ending with the sentence, "It's so effective that ...." The ad was removed and the respondents were asked to give the name of the medication that doctors had prescribed. The respondents were then reminded that the ad says that "Advil contains ibuprofen, the same medicine that's in the prescription drug Motrin. But now it's available in nonprescription strength." The respondents were then asked whether Advil is made by the same manufacturer that produces Motrin or whether it is made by a different manufacturer. They were also reminded that the advertisement stated that "Advil contains ibuprofen, the same medicine that's in the prescription drug Motrin." Following this reminder, they were asked whether the statement meant that Advil could be substituted for Motrin.

Finally, the ad was shown again to the respondents, who were then shown a Motrin tablet and an Advil tablet pasted, brand name down, to a white cardboard square. The respondent was asked which of the two tablets was portrayed in the picture in the advertisement and then to explain what it was about the tablet chosen that made it look like the one in the ad.

Thirty three per cent of the respondents named Advil as the pain medication that doctors have prescribed over 130 million times. When asked to choose which of the two pills was depicted in the advertisement, seventy six per cent of the respondents chose the Motrin tablet. Seventy one per cent of these respondents stated that their choice was influenced by the color of the tablets. These results suggest that "a not insubstantial number of consumers receive a false [or] misleading impression from" the color of the tablet and the statements made in the ad. *See R.J. Reynolds Tobacco Co.*, 511 F.Supp. at 876 (quoting *McNeilab, Inc.*, 501 F.Supp. at 528).

Defendants argue that the survey suffers from a number of flaws which render the results invalid. First, they assert that the survey does not measure confusion among the relevant group—serious arthritis sufferers. A survey must reflect the beliefs of the purchasers that the plaintiff asserts will be confused. *See American Basketball Association v. AMF Voit, Inc.*, 358 F.Supp. 981, 986 (S.D.N.Y.), *aff'd*, 487 F.2d 1393 (2d Cir.1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974). The Court does not find, however, that Upjohn's allegations are limited to the possibility of confusion among consumers with serious arthritis. Upjohn's allegations apply to the possibility of confusion among all consumers. The consequences of confusion may be more serious for consumers with serious arthritis, but this does not mean that Upjohn is not damaged by confusion among consumers in general.

The survey does not report every respondent's answer to each question. The questions concerning the manufacturer of Advil and whether Advil could be substituted for Motrin suggest the answer that the survey was looking for. The answers to these questions, therefore, cannot be relied upon by the Court as demonstrating customer confusion. *See Mennen Company v. Gillette Company*, 565 F.Supp. 648, 652–53 (S.D.N.Y.1983). The Court finds, however, that the answers to the questions

that were not flawed, particularly the question concerning the medication that doctors had prescribed and the question in which the respondents were asked to choose the tablet portrayed in the ad, demonstrate that a "not insubstantial" number of consumers were deceived or misled. *See Coca-Cola Co.*, 690 F.2d at 317.

Furthermore, although the Court's own reaction to the advertisement is not determinative, it is obliged to judge for itself whether the evidence of record establishes that consumers are likely to be misled or confused. *McNeilab, Inc.*, 501 F.Supp. at 525. As the Court finds that the use of pronouns and antecedents in the paragraph ending with the sentence, "It's so effective ..." is so confusing as to be almost "grammatically untrue," it credits the reliable portions of the survey that demonstrate customer confusion.

The Court also notes, although it is not necessary for the purposes of this motion, that there is a public interest in avoiding confusion between Advil and Motrin above and beyond what is presented in the usual infringement case. *See Philip Morris Incorporated v. Loew's Theatres, Inc.*, 511 F.Supp. 855, 858 (S.D.N.Y.1980); *Syntex Laboratories, Inc. v. Norwich Pharmaceutical Company*, 315 F.Supp. 45, 53 (S.D.N.Y.1970), *aff'd*, 437 F.2d 566 (2d Cir.1971). Dr. Alexander M. Schmidt, former Commissioner of the Food and Drug Administration, testified before this Court that the indications for which Motrin and Advil are approved by the FDA are different. The testimony of Dr. Francis McMahon, clinical professor of pharmacology at Tulane University Medical School, indicated that there is some overlap in the indications for which the two drugs are approved and that some people who take Motrin by prescription can properly take Advil if they take it for 10 days or less. On the basis of this testimony, the Court concludes that, although there may be some overlap in the indications for which these two drugs are ap-

proved, confusion as to their substitutability is not in the public interest.[2]

The Court finds that plaintiff has demonstrated irreparable injury and likelihood of success on the merits of its claim that the orange color of the tablet and the challenged claims concerning Advil violate its rights under the Lanham Act. Defendants, therefore, are preliminarily enjoined from depicting the tablet as orange and using the language contained in the paragraph of the print ad ending with the sentence, "It's so effective that doctors have already prescribed it over 130 million times."

## THE REVISED TELEVISION ADVERTISEMENT

Upjohn also commissioned a market survey with regard to the revised television ad. Another questionnaire was devised by Dr. Appel. This questionnaire was administered to a sample of 121 Motrin users and 217 users of other analgesics, age 18 or older found in 10 shopping malls throughout the country. These malls were located in Atlanta, Baltimore, Boston, Chicago, Detroit, Houston, Los Angeles, Nassau-Suffolk (New York), Philadelphia and Washington, D.C.

After they were screened for eligibility, the respondents were shown the revised Advil television commercial. They then were asked to relate everything they had seen and heard in the commercial. They were also asked to name the ingredient which, according to the commercial, was found in Advil.

The respondents were asked to name all the drugs they could recall being mentioned in the commercial they had just viewed. If a respondent did not identify aspirin, Tylenol or Motrin in response to this question, he was asked if he recalled the commercial saying anything about whichever of the three drugs mentioned in the ad—aspirin, Tylenol or Motrin—the respondent had not identified. If the respondent then remembered any of the three

drugs, he was asked to recollect what the commercial said about each of them and whether, based on the commercial, he agreed that people taking each of these drugs could now take Advil instead. Each respondent was then asked whether the company that makes Advil was the same company that produces Motrin or whether Advil was made by another company or whether the respondent did not know. The order of this question was varied.

The commercial was shown again to the respondents, who were asked to pay special attention to the pictures of the Advil tablet. The respondents were then shown a Motrin tablet and an Advil tablet pasted to a white cardboard square, brand names down, and asked which tablet was portrayed in the commercial.

When asked what the ingredient was in Advil, twenty nine per cent of the Motrin users and eighteen per cent of the non-Motrin users responded "Motrin." When reminded of the three drugs mentioned in the commercial and asked whether they agreed or disagreed that someone taking each one could now take Advil instead, seventy four per cent of Motrin users that recalled that Motrin was mentioned in the commercial agreed; sixty seven per cent of such non-Motrin users agreed. Of the Motrin users taking significant daily dosages of Motrin that recalled Motrin was mentioned in the commercial, seventy nine per cent agreed that people taking Motrin can now take Advil instead. When asked to identify which tablet was the one portrayed in the revised commercial, thirty per cent of the Motrin users and thirty nine per cent of the non-Motrin users selected the Motrin tablet. The most frequently given reason for selecting the Motrin tablet was the color; the second was size.

Only six per cent of the Motrin users and four per cent of the non-Motrin users recalled either or both of the supers intended to convey that Advil is not manufactured

**2.** The Court does not base the injunction on this finding, however. "An action under the Lanham Act ... is not the proper legal vehicle in which to vindicate the public's interest in health and safety." *American Home Products v. Johnson & Johnson,* 436 F.Supp. 785, 797–98 (S.D.N.Y.1977), *aff'd,* 577 F.2d 160 (2d Cir.1978).

by the same company that makes Motrin. When asked directly whether Advil was made by the same company, fifty five per cent of the Motrin users and seventy one per cent of the non-Motrin users said they did not know and fourteen per cent of the Motrin users and fifteen per cent of the non-Motrin users said that Advil was made by the same company that makes Motrin.

These results suggest that the commercial is misleading or confusing to consumers. The Court finds, however, that the results are unreliable. Therefore, they do not establish probable success on the merits of plaintiff's claim that the advertising has a tendency to mislead consumers.

In tabulating the responses to the question, "What is the main ingredient of Advil?" Dr. Appel included in the percentage of respondents answering "Motrin," those respondents whose answers to other questions suggested that they were using the term generically and not to mean Motrin brand tablets. Only six of the thirty five Motrin users who thought Motrin was the main ingredient in Advil thought that Motrin and Advil were made by the same manufacturer. Some of the respondents who answered "Motrin" in response to the ingredient question stated that the commercial indicated that Advil contained the same ingredient as Motrin in response to open ended questions. These answers, demonstrating an awareness that Motrin-brand tablets are not the principle ingredient in Advil, suggest that the respondents were using the term "Motrin" in response to the ingredient question generically to identify the drug contained in Advil and not to identify the source of the ingredient in Advil. No efforts were made to clarify respondents' answers to the ingredient question despite the fact that apparently contradictory answers were given to other questions. As the survey does not adequately explain and probe the meaning of the responses to the ingredient question on the relevant issues, the Court does not credit the responses to the ingredient question as evidence of customer confusion as to the content and source of Advil. *See*

*E.I. DuPont de Nemours and Company v. Yoshida International, Inc.,* 393 F.Supp. 502, 525–27 (E.D.N.Y.1975).

The responses to the question whether the ad stated that people could now take Advil instead of Motrin are also of questionable value in evaluating consumer confusion. Respondents were asked whether, based on the commercial, they agreed or disagreed that people taking Motrin could now take Advil instead. It is unclear what an "agree" answer to this question means. As defendants' expert, Walter McCullough, President of Monroe Mendelsohn Research, stated, the question is unspecific as to time, place and circumstances. It is unclear whether an agree answer means that the respondent believes that the commercial stated that "all people, some people [or] certain people" can take Advil rather than Motrin. It is also unclear whether an agree answer means that the respondent believes that Advil can be taken under all circumstances instead of Motrin or only under certain circumstances.

These distinctions are important. Dr. Appel admitted on cross examination that the respondents might have interpreted the question as asking whether Advil could be taken instead of Motrin for pain relief. The testimony and evidence submitted indicate that both products are approved for treating pain. Similarly, both products are indicated for some form of dysmenorrhea. Thus under certain circumstances, one product could be taken instead of the other, particularly if the consumer's physician believes that smaller doses of ibuprofen are appropriate. An "agree" answer might reflect the respondent's belief that some people under certain circumstances can take Advil instead of Motrin. As this belief would be correct, the agree answer would not reflect any confusion on behalf of the respondent. As there is no way in which the Court can evaluate what each "agree" answer meant, the Court cannot credit the number of "agree" answers as demonstrating that the advertisement has a tendency to mislead consumers into believing that one product can be substituted for another.

# 560

This is particularly true in light of the fact that only two per cent of the respondents stated that the commercial claimed that Advil could be substituted for Motrin in answer to an open ended question as to what the commercial said about Advil.

The Court also notes that the reliability of the answers to the question whether Advil could be taken instead of Motrin is further impaired by the failure to inform respondents that they need not have an opinion on this issue. When the potential answers to this question were read to respondents a "don't know" alternative was not included. Mr. McCullough testified, and Dr. Appel admitted, that the failure to include a "don't know" alternative increases the likelihood that the respondent will guess which of the alternatives provided is correct.

Furthermore, the percentage figures submitted by Dr. Appel are misleading. Dr. Appel's evaluation of the responses to this question is based on only those respondents who remembered that Motrin was mentioned in the ad. Thus he omitted from his evaluation almost one third of the total respondents. Surely, these respondents were not confused. They did not even remember that Motrin had been mentioned in the advertisement.

The Court finds that data gathered in response to the question whether Advil was made by the same manufacturer as Motrin or by a different manufacturer also fails to demonstrate that the ad has a tendency to mislead consumers. The figures presented by plaintiff reflect the responses of respondents who did not even recall that Motrin had been mentioned. It is likely that these respondents who did not remember a reference to Motrin in the ad were guessing when they said that the ad claimed that Advil was made by the same manufacturer as Motrin. On cross examination Dr. Appel admitted that the respondents who did not remember Motrin should not have been asked this question as there was a substan-

tial likelihood that their answers would be guesses.

Furthermore, the question is biased. The form of the question suggests the answer the survey is seeking. That answer was the most specific alternative and referred back to a brand name mentioned in the ad and a number of times previously in the survey. No names were included in the other alternative answers. As Mr. McCullough testified, at the point in the survey when this question was asked, it was quite clear that the study was concerned with Motrin[3] and the respondents were conditioned to think in terms of brand names. Respondents, aware now that the survey was concerned with Motrin, may have assumed that the answer containing the term Motrin was the right answer. The other alternative, "a different company" is vague and, in Mr. McCullough's words, appears to the respondent as a "cop out."

The Court is aware that Judge Lasker in *McNeilab Inc.*, 501 F.Supp. at 528, rejected criticisms of a survey that were based on the contention that specific questions were biased. Judge Lasker, however, did not have evidence before him derived from the survey itself that supported the conclusion that the bias in the specific question influenced the answers to that question. When respondents were asked what the commercial said about Advil, only two per cent of them stated that Advil was made by the same manufacturer. Thus, absent the question suggesting the desired answer, it did not occur to most of the respondents that the commercial stated that the two products were made by the same manufacturer.

To substantiate its claim that the revised advertising is misleading, plaintiff must introduce tests and other proof acceptable to the Court. *See American Brands, Inc.*, 413 F.Supp. at 1357. As the Court finds that overall the survey is unreliable, plaintiff has failed to demonstrate that the revised television advertisement or the print

**3.** Motrin is mentioned in the advertisement once, as are Tylenol and ibuprofen. Aspirin is mentioned four times and Advil five times. In the survey questions, however, Motrin is mentioned at least three times before this question is asked.

ads and promotional materials with similar characteristics have a tendency to mislead consumers. Plaintiff has the burden of establishing probable success on the merits of its claim that the revised advertising tends to confuse or mislead consumers. *See Proctor & Gamble Co. v. Chesebrough-Pond's*, 747 F.2d 114, 119 (1984); *Mennen Co.*, 565 F.Supp. at 654–55. As plaintiff has failed to meet this burden, relief must be denied with regard to this advertising.

The Court is troubled by the responses to the question in the survey asking respondents to choose the tablet depicted in the ad. It does not feel, however, that a further injunction against defendants' use of color in their advertising is appropriate. The Court has enjoined the defendants from depicting the tablet as orange. In the Court's judgment, the color of the mock up used to make the revised television commercial is brown, and appears brown in the commercial. Defendant, however, cannot control the color adjustment on every potential viewer's television set. Defendant is directed, however, that under the injunction the brown mock up is not to be filmed or photographed in a manner that gives it an orange cast.

■ Furthermore, other than requiring defendants to change the color of the Advil tablet itself, the only further relief that would reduce potential confusion would be to enjoin defendants from mentioning Motrin in their advertising. Defendants argue that the term Motrin has informational value and, therefore, its use cannot be enjoined under the Lanham Act, as the Act does not compel competitors to resort to the second best means of communication. *G.D. Searle & Co. v. Hudson Pharmaceutical Corporation*, 715 F.2d 837, 842 n. 12 (3d Cir.1983). More accurately, reference to a trademark cannot be enjoined if its use

is informational and not likely to cause confusion as to the product's source or qualities. *Sutton Cosmetics, Inc. v. Lander Co., Inc.*, 455 F.2d 285, 288 (2d Cir. 1972); *Cuisinarts, Inc. v. Robot-Coupe International Corporation*, 580 F.Supp. 634, 637 (S.D.N.Y.1984). Plaintiff contends, however, that its trademark, Motrin, cannot be used as a generic shorthand for ibuprofen because such use dilutes the mark. The Court finds that although the ads refer to Motrin for its informational value, they do not use it as a generic shorthand. The television ad says, "Advil contains a nonprescription strength of ibuprofen, the medicine found in the prescription brand, Motrin." This is a comparative reference that aids the consumer in identifying ibuprofen[4], not a generic shorthand. Use of the trademark in this manner is permissible. *Polyglycoat Corporation v. Environmental Chemicals, Inc.*, 509 F.Supp. 36, 40 (S.D.N.Y.1980).

■ Furthermore, the revised advertisements themselves contain disclaimers indicating that Motrin is made by another manufacturer. Such disclaimers are preferred to an absolute prohibition of the potentially misleading reference as a means of alleviating customer confusion. *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386 (1947); *Consumers Union*, 724 F.2d at 1053; *see In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982). To enjoin language where there is a reasonable possibility that a disclaimer would suffice would violate first amendment. *Consumers Union*, 724 F.2d at 1053. The Court finds that, although on open ended recall only a small percentage of the respondents actually remembered the supers stating that Advil and Motrin were made by different companies, in response to the same open ended question

---

**4.** The informational value of comparing the new OTC ibuprofen to Motrin is evidenced by non-advertising information released to the public. The Department of Health and Human Services in reporting approval of OTC sale of ibuprofen identified ibuprofen by stating that it had previously been available in larger doses under the brand names Motrin and Rufen. In a press release, reporting developments with respect to its application for approval of OTC ibuprofen, plaintiff stated that it had been marketing ibuprofen in a stronger form under the trade name Motrin.

**562**

even fewer respondents thought that Advil and Motrin were made by the same manufacturer. The Court, therefore, finds that there is a reasonable possibility that the message conveyed in the super is sufficient to counteract any misleading effect of mention of Motrin in the television ad.[5]

The Court denies plaintiff's motion to the extent that it applies to the revised advertising and promotional materials and that it is based on the second survey, and grants plaintiff's motion to the extent that it seeks an injunction against depiction of the tablet as orange and use of the confusing language in the paragraph ending with the sentence, "It's so effective that doctors have already prescribed it over 130 million times."

SO ORDERED.

---

**5.** The Court does not rely on the biased directed question concerning the source of Motrin in this regard. The only figures that the Court has with regard to recall of the supers is derived from responses to the open ended question. The Court has, thus, compared the figures with regard to recall of the supers with the figures with regard to the manufacturer of Advil that have been derived from the responses to the open ended question. The responses to the directed question would be more relevant if they could be compared to responses to directed questions concerning the supers.